## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| SHARON CLAYTON, *et al.*, | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Case No.: 1:18-cv-02511-RDB |
| | * | |
| DELMARVA COMMUNITY | * | |
| SERVICES, INC., *et al.*, | * | |
| | * | |
| Defendants. | * | |
| _____/ | | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

Date: May 6, 2019

Respectfully submitted,


_____/s/_____
Teresa D. Teare (Bar No. 28055)
Paul D. Burgin (Bar No. 20228)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, MD 21202
Telephone:  (410) 752-1040
Facsimile:  (410) 752-8861
teare@shawe.com
burgin@shawe.com

*Attorneys for Defendant Delmarva Community Services, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iv

I.    INTRODUCTION ......................................................................................................1

II.   STATEMENT OF UNDISPUTED MATERIAL FACTS ...................................2

    A.  The Parties .....................................................................................................2

    B.  The Inception Of Delmarva's Residential Program And
        The Sleep Staff Position.................................................................................3

    C.  The Terms And Conditions Of The Sleep Staff Position .........................................4

    D.  Plaintiffs Accepted The Position With A Full
        Understanding Of Its Requirements.................................................................8

    E.  Plaintiffs Accepted And Continued To Work In The Sleep Staff
        Position For Years.........................................................................................12

    F.  Plaintiffs Were Paid Over Minimum Wage And Overtime At
        Time And One Half Of Their Regular Rate........................................................14

    G.  The Required Postings Were Conspicuously Displayed At
        Delmarva's Headquarters..............................................................................15

III.  ARGUMENT.......................................................................................................16

    A.  The Summary Judgment Standard .....................................................................16

    B.  Plaintiffs' Claims Are Governed, And Barred, By 29 C.F.R. §785.23 .................16

        1. Plaintiffs Lived At The Residential Homes For An
           Extended Period Of Time ....................................................................17

        2. There Was An Implied Agreement to Deduct Sleep Time ......................18

        3. The Implied Agreement Was Reasonable.................................................21

           ii.     The Sleep Staff Position Is Part Of The
                  Framework Given To Delmarva By The State .........................21

           iii.    Plaintiffs Were Adequately Compensated For
                  The Work They Performed .....................................................23

iv.    The Regulation Does Not Mention Facilities,
However, The Facilities Were Sufficient................................25

v.    The Wage And Hour Division Bulletins Are
Not Entitled To Deference ......................................................29

C.  Plaintiffs' State Law Claims Fail Because Defendants'
Complied With The FLSA...............................................................................30

D.  Equitable Tolling Of The Statute Of Limitations Is Not Warranted ....................32

1.  Statute of Limitations.............................................................................32

2.  Equitable Tolling ...................................................................................33

IV.    CONCLUSION...........................................................................................................35

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby Inc.*
477 U.S. 242 (1986).................................................................................................16

*Auer v. Robbins*
519 U.S. 452 (1997).................................................................................................26

*Balbed v. Eden Park Guest House, LLC*
881 F.3d 285 (4th Cir. 2018) ...................................................................................31

*Beaston v. Scotland Sch. For Veterans' Children*
693 F. Supp. 234 (M.D. Pa. 1988).....................................................................18, 28

*Blackburn v. Kansas Elks Training Center*
40. F. Supp. 2d 1270 (D. Kan. 1999).......................................................................23

*Bodie v. City of Columbia, S.C.*
934 F.2d 561 (4h Cir. 1991).....................................................................................19

*Braziel v. Tobosa Dev. Servs.*
166 F.3d 1061 (10th Cir. 1999) ..........................................................18, 19, 20, 22, 30

*Calderon v. GEICO Gen. Ins. Co.*
809 F.3d 111 (4th Cir. 2015) ...................................................................................32

*Celotex Corp. v. Catrett*
477 U.S. 317 (1986).................................................................................................16

*Christensen v. Harris Cnty.*
529 U.S. 576 (2000).................................................................................................26

*Coll. Loan Corp. v. SML Corp.*
396 F.3d 588 (4th Cir. 2005) ..............................................................................31, 32

*Cunningham v. Comm'r of Internal Revenue*
716 F. App'x 182 (4th Cir. 2018) .............................................................................34

*Cruz v. Maypa*
773 F.3d 138 (4th Cir. 2014) ...................................................................................34

*Escamilla v. Nuyen*
227 F. Supp. 3d 37 (D.D.C. 2017)............................................................................35

*Garofolo v. Donald B. Heslep Assocs., Inc.*
405 F.3d 194 (4th Cir. 2005) .......................................................................21, 28, 29

*Guerra v. Teixeira*
Civ. No. CV TDC-16-0618, 2019 WL 330871 (D. Md. Jan. 25, 2019) ...........................32, 33, 34

*Harris v. Hutchinson*
209 F.3d 325 (4th Cir. 2000) .......................................................................33

*Hendricks v. Oklahoma Prod. Ctr. Grp. Homes, Inc.*
159 F. App'x 875 (10th Cir. 2005) .................................................................19, 22

*Johnson v. City of Columbia, S.C.*
949 F.2d 127 (4th Cir. 1991) .......................................................................19

*Kisor v. Wilkie*
No. 18-15, 139 S. Ct. 657, 202 L. Ed. 2d 491 (2018)..............................................26

*Leever v. City of Carson*
360 F.3d 1014 (9th Cir. 2004) ......................................................................21

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
475 U.S. 574 (1986)...............................................................................16

*Minotti v. Whitehead*
584 F. Supp. 2d 750 (D. Md. 2008)..................................................................26

*Mitchell v. Data Gen. Corp.*
12 F.3d 1310 (4th Cir. 1993) .......................................................................16

*Myers v. Baltimore Cty., Maryland*
50 F. App'x 583 (4th Cir. 2002) ....................................................................29

*Nat'l Home Equity Mortg. Ass'n v. Face*
239 F.3d 633 (4th Cir. 2001) .......................................................................31

*Ormsby v. C.O.F. Training Services, Inc.*
194 F. Supp. 2d 1177 (D. Kan. 2002), *aff'd*, 60 F. App'x 724 (10th Cir. 2003) ...........................22

*S. Blasting Servs., Inc. v. Wilkes Cnty., N.C.*
288 F.3d 584 (4th Cir. 2002) .......................................................................32

*Shannon v. Pleasant Valley Cmty. Living Arrangements, Inc.*
82 F. Supp. 2d 426 (W.D. Pa. 2000)..................................................................17, 29

*Sheedy v. BSB Properties, LC*
Civ. No. 2:13-CV-290-JNP, 2016 WL 6902493 (D. Utah Jan. 26, 2016)....................................29

*Sidell v. Residential CRF, Inc.*
Civ. No. 1:08-CV-1699-SEB-DML, 2010 WL 4723722 (S.D. Ind. Nov. 12, 2010) ........18, 22, 25

*Skidmore v. Swift & Co.*
323 U.S. 134 (1944)........................................................................................................26, 30

*Skrzecz v. Gibson Island Corp.*
Civ. No. RDB-13-1796, 2014 WL 3400614 (D. Md. July 11, 2014) ...........................................30

*Trocheck v. Pellin Emergency Med. Serv., Inc.*
61 F. Supp. 2d 685 (N.D. Ohio 1999)........................................................................................25

*Whiteside v. U.S.*
775 F.3d 180 (4th Cir. 2014) (en banc) ......................................................................................34

## Statutes and Regulations

29 U.S.C § 251(a)(4).....................................................................................................................29

29 U.S.C. § 255(a) ........................................................................................................................32

29 C.F.R. § 785.21 ..................................................................................................................16, 28

29 C.F.R. § 785.22 ............................................................................................................16, 22, 27

29 C.F.R. § 785.23 ......................................1, 16, 17, 18, 21, 27, 28, 29, 30, 31, 32

Fed. R. Civ. P. 56 .........................................................................................................................16

## Guidance

Dep't of Labor, *Opinion Letter Fair Labor Standards Act* (February 3, 1981)
1981 WL 179033 ..........................................................................................................................25

Dep't of Labor, *Hours Worked in Residential Care (Group Home)*
*Establishments—Sleep Time and Related Issues—Enforcement Policy* (June 30, 1988)
1988 WL 614199 ..........................................................................................................................25

Dep't of Labor, *Exclusion of Sleep Time from Hours Worked by*
*Domestic Service Employees* (Apr. 25, 2016) ......................................................................25, 28

# I.      INTRODUCTION

Five former and current employees have sued Delmarva Community Services, Inc. and its President, Santo Grande, claiming that they should have been paid for the time they slept when they were employed as Residential Community Living Assistants.  Although it is axiomatic that one cannot work and sleep at the same time, Plaintiffs are not entitled to compensation for their sleep time under the law because Plaintiffs were employees who resided on the employer's premises for extended periods of time pursuant to 29 C.F.R. § 785.23, which provides a presumption that employees such as Plaintiffs are not working the entire time they are on the premises.  Indeed, the law allows employees who reside on the premises for an extended period of time and their employers to enter into a reasonable agreement to exclude sleep time from time worked.

The undisputed record evidence demonstrates that Delmarva and Plaintiffs entered into a reasonable agreement to deduct sleep time from time worked.  Plaintiffs knew and understood that they would not be compensated for their sleep time at the time of hire, accepted the position with that understanding, and continued to work in the Sleep Staff position for years without complaint.  The agreement to deduct sleep time from time worked was reasonable because the Plaintiffs were provided sufficient living and sleeping facilities, Plaintiffs were paid for their interruptions to sleep time, which were not frequent, Plaintiffs had more than enough time to complete their actual work (care for the disabled adults), as every Plaintiff testified to having a substantial amount of downtime while still on the clock, and Plaintiffs indeed used the time for sleeping or other private pursuits.  Accordingly, Plaintiffs' claims under the Fair Labor Standards Act fail as a matter of law.

Plaintiffs' Maryland Wage and Hour Law and Maryland Wage Payment and Collection Law claims similarly fail because the state law regulations are silent as to the compensability of

1

sleep time, requiring the Court to look to the FLSA in addressing Plaintiffs' state law claims. Because Plaintiffs' FLSA claims fail as a matter of law, so too do their state law claims.

While Defendants submit that they are entitled to judgment as a matter of law as to liability, to the extent that Plaintiffs' claims are time-barred, those claims should be dismissed. The statutes of limitations under the FLSA is two years, unless the violation is willful. Under the Maryland Wage and Hour Law and Maryland Wage Payment and Collection Law, the statute of limitations is three years. There is no evidence of willfulness as to whether Plaintiffs are entitled to pay for sleep time. Moreover, the doctrine of equitable tolling to extend the recovery period is inappropriate as the undisputed facts show that Delmarva conspicuously displayed all required employment notices in their headquarters and Plaintiffs recognized the postings. Accordingly, portions of Plaintiffs' claims are barred by the statute of limitations and should be dismissed.

For the reasons, more fully discussed herein, the Court should grant Defendants' motion for summary judgment and dismiss this case with prejudice.

## II.       STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.  Delmarva's Residential Program And The Sleep Staff Position

1.      Defendant Delmarva Community Services, Inc. is a non-profit organization that provides a variety of services in several Maryland and Delaware counties, including, but not limited to, day services for senior citizens and people with developmental disabilities, vocational services, community transportation, poverty programs, and respite and relief care. Ex. 1, Grande Dep. 11:21, 12:2-13:11. Delmarva also operates a Developmental Disabilities program that provides residential services to disabled adults ("clients") in residential homes. Ex. 1, Grande Dep. 12:18-19; Ex. 2, Clayton Dep. 59:18-20; Ex. 3, Thomas Dep. 53:8-10.

2.      Defendant Santo Grande is the President and CEO of Delmarva Community Services.  Ex. 1, Grande Dep. 10:13.

3.      Delmarva began its residential program in 1979 or 1980, and it has operated in a similar fashion since that time.  Ex. 1, Grande Dep. 27:9.  Delmarva's residential program was developed in coordination with the Maryland Developmental Disabilities Administration ("DDA").  Ex. 4, Grande Decl. ¶ 5; Ex. 1, Grande Dep. 28:13-29:10.  The DDA provides Delmarva with funding, and it designed staffing models for Delmarva that could fit within the funding provided.  Ex. 1, Grande Dep. 42:17-19; Ex. 4, Grande Decl. ¶ 6; Ex. 5, Benson Dep. 46:1-6.

4.      Part of the design bestowed upon Delmarva by the DDA included Community Living Assistant ("CLA") positions with a Sleep Staff shift.  Ex. 1, Grande Dep. 26:21-27:7, 28:13-29:10.  Sleep Staff are not compensated during the time they spend sleeping overnight in Delmarva's residential homes.  Ex. 1, Grande Dep. 26:21-27:7, 28:13-29:10.  This became a standard practice in the industry based on the guidance and funding provided by the State.  Ex. 1, Grande Dep. 34:19-35:7.  The funding DDA provides is based on the needs of the particular client.  Ex. 4, Grande Decl. ¶ 7; Ex. 5, Benson Dep. 46:1-47:3.  Higher need clients are funded for awake overnight assistance, for which staff are required to stay awake overnight and are paid.  Ex. 4, Grande Decl. ¶ 8.  Lower need clients are provided less funding, and notably, the State of Maryland does not fund overnight awake assistance.  Ex. 4, Grande Decl. ¶ 9.

**B.  The Plaintiffs Were Employed As Sleep Staff**

5.      Plaintiffs Clayton, Thomas, Travers, Carr, and Justice were employed as CLAs in a Sleep Staff shift position at varying times, in varying residential homes.  Ex. 2, Clayton Dep. 103:8-19, 105:5-14; Ex. 3, Thomas Dep. 58:10-12, 78:17-79:5, 100:12-101:12, 120:16-20, 133:8-

10, 151:13-15;  Ex. 6, Travers Dep. 43:11-14, 59:2-6, 63:7-12, 72:16-19, 97:9-98:10, 100:6-11, 101:20-102:2; Ex. 7, Justice Dep. 43:1-3, 51:2-52:3, 67:17-68:1; Ex. 8, Carr Dep. 83:8-20.

6.    As CLAs, Plaintiffs helped Delmarva's clients live an independent lifestyle in Delmarva's residential homes.  Ex. 3, Thomas Dep. 67:19-68:2.  They were responsible for providing individual care, supervision, and assistance to clients during activities.  Ex. 3, Thomas Dep. 68:3-7; Ex. 2, Clayton Dep. 84:19-85:3.  CLAs assist the clients with daily living activities on an as needed basis and provide for the safety of the clients.  Ex. 3, Thomas Dep. 68:8-10. Plaintiffs were also responsible for maintaining a homelike environment that was conducive to the development and well-being of the clients.  Ex. 2, Clayton Dep. 86:1-6; Ex. 3, Thomas Dep. 68:11-15.

7.    Delmarva's residential homes are either single family houses, or apartments, replete with all of the furnishings and amenities one would find in a private house.  Ex. 3, Thomas Dep. 86:1-3; Ex. 8, Carr. Dep 106:20-107:7.

8.    The Plaintiffs only seek compensation for the time in which they spent sleeping in Delmarva's residential homes as Sleep Staff.  Ex. 2, Clayton Dep. 146:20-147:5; Ex. 3, Thomas Dep. 17:17-21, 153:7-12; Ex. 6, Travers Dep. 157:16-158:11; Ex. 7, Justice Dep. 13:10-20, 107:15-108:12; Ex. 8, Carr Dep. 121:2-11.

### C.  The Terms And Conditions Of The Sleep Staff Position

9.    As Sleep Staff, Plaintiffs worked seven days on and seven days off, every other Thursday to Thursday.  ECF No. 35, Third Amended Complaint ¶ 23 (hereinafter "Compl.").

10.   Plaintiffs' agreed upon hours of work for Sleep Staff, which was subject to minor variations, was generally as follows:

Thursday:      3:00 p.m. – 10:00 p.m.
Friday:           6:00 a.m. – 8:30 a.m.; 3:00 p.m. – 11:00 p.m.

4

Saturday:        7:00 a.m. – 11:00 p.m
Sunday:         7:00 a.m. – 11:00 p.m.
Monday:       6:00 a.m. – 8:30 a.m.; 3:00 p.m. – 10:00 p.m.
Tuesday:       6:00 a.m. – 8:30 a.m.; 3:00 p.m. – 10:00 p.m.
Wednesday:   6:00 a.m. – 8:30 a.m.; 3:00 p.m. – 10:00 p.m.
Thursday:      6:00 a.m. – 8:30 a.m.
Off until the following Thursday

Ex. 3, Thomas Dep. 102:11-19, 104:17-109:17, 136:17-137:4; Ex. 2, Clayton Dep. 105:21-109:7;

113:16-114:2; Ex. 2, Carr Dep. 77:19-78:1, 79:21-80:18; Ex. 7, Justice Dep. 68:2-19; Ex. 6,

Travers Dep. 54:1-55:5, 106:20-107:10, 108:2-10, 133:7-11.

11.     The time the Plaintiffs clocked out at the end of the day until they clocked back in

the next morning was time designated for them to sleep, or engage in personal pursuits as they

desired. Ex. 2, Clayton Dep. 106:12-17, 107:17-20; Ex. 3, Thomas Dep. 105:7-109:13; Ex. 8, Carr

Dep. 113:20-114:9; Ex. 6, Travers Dep. 108:2-17, 116:7-117:1, 119:5-14, 132:18-133:6; Ex. 7,

Justice Dep. 68:2-6.

12.     If Plaintiffs were awoken overnight to assist a client, they were instructed to clock

in while attending to the situation in order to be paid for time spent working.  Plaintiffs testified

that they did so, with the exception of Carr, who said she knew that she could clock in, however

she "didn't see the use to clock in for 10 minutes."  Ex. 8, Carr Dep. 92:1-10.  The Plaintiffs,

however, were rarely awoken to assist residents during the night.  Compl. ¶¶ 22, 33; Ex. 2, Clayton

Dep. 104:7-12, 105:15-20, 160:19-161:8, 162:19-164:3;  Ex. 3, Thomas Dep. 56:3-7, 74:9-16,

138:1-4, 158:4-6; Ex. 8, Carr Dep. 92:1-10; Ex. 6, Travers Dep. 106:3-19, 124:20-125:16; Ex. 7,

Justice Dep. 77:5-10.

13.     Plaintiffs clocked in and out using Delmarva's e-time system.  Plaintiffs used the

house phone in the residential homes to clock in and clock out.  In order to do so, Plaintiffs dialed

a number, after which they entered a personal code.  Ex. 2, Clayton Dep. 71:20-72:18, 80:5-12;

Ex. 3, Thomas Dep, 73:18-74:8, 136:2-16; Ex. 6, Travers Dep. 117:2-18, 131:15-132:7; Ex. 7, Justice Dep. 65:1-66:3; Ex. 8, Carr Dep. 72:17-73:15.  If Plaintiffs missed a punch or had any issue with their pay, they knew to bring the issue to their supervisor, who ensured that Plaintiffs were paid for the amount that they were claiming.  Ex. 2, Clayton Dep. 72:19-73:9, 80:13-19, 148:12-149:9;  Ex. 3, Thomas Dep. 158:7-159:12; Ex. 6, Travers Dep. 117:19-118:19; Ex. 7, Justice Dep. 66:4-19; Ex. 8, Carr Dep. 75:17-77:18.

14.     Plaintiffs all had private sleeping quarters which they did not share in each home in which they were Sleep Staff.  Ex. 1, Grande Dep. 25:18-26:3 ("they were given privacy and they were given an opportunity to sleep a full evening, five to eight hours").

15.     Clayton testified that, at the Thompson Street residence, she had her own bedroom and did not share her sleeping space with anyone. Ex. 2, Clayton Dep. 114:6-13, 156:6-18.  *See also* Ex. 5, Benson Dep. 26:13-27:4.

16.     Thomas testified that as Sleep Staff at Thompson Street she had her own bedroom (Ex. 3, Thomas Dep. 79:20-80:7), she had her own sleeping area at Glenburn that she did not share with anyone (Ex. 3, Thomas Dep. 121:17-122:5, 122:21-123:9), and at Cabin Creek she also did not share her sleeping quarters.  Ex. 3, Thomas Dep. 138:19-21.  *See also* Ex. 5, Benson Dep. 35:2-11.

17.     Travers testified that for the few months in which she was Sleep Staff at Birch Drive in 2006, she had her own sleeping area that she did not share with anyone.  Ex. 6, Travers Dep. 121:6-14.  According to Travers, she had her own bedroom when she was Sleep Staff at Woolford and Shepherd Avenue.  Ex. 6, Travers Dep. 124:1-2, 125:17-126:7, 136:12-14, 139:8-10.  Travers referred to her bedroom at Shepherd Avenue as a "private room."  Ex. 6, Travers Dep. 142:12-13.

18.     Justice testified that at Cambridge Commons he did not share his sleeping quarters with any residents or staff.  Ex. 7, Justice Dep. 100:17-101:2.  At Peach Blossom, Justice testified that he had his own bedroom.  Ex. 7, Justice Dep. 70:21-71:2, 72:15-17.

19.     According to Carr, she did not share her sleeping quarters at Glenburn and she had a bedroom in which she slept and was afforded privacy.  Ex. 8, Carr Dep. 100:10-101:7, 104:17-105:7.  At Race Street, Carr testified that she had her own sleeping quarters in which no one else slept while she was there.  Ex. 8, Carr Dep. 109:1-9.

20.     Plaintiffs' sleeping quarters had a bed,[1] a lamp or lighting, a dresser and/or nightstand, and some had a television, closet, chair, and additional furniture.  Ex. 2, Clayton Dep. 114:14-115:15, 128:21-129:13; Ex. 3, Thomas Dep. 80:10-20, 94:1-21, 123:15-124:11, 139:19-140:20, 141:15-142:19; Ex. 8, Carr Dep. 101:11-112:13; Ex. 6, Travers Dep. 126:8-127:16, 136:15-137:6, 138:21-139:10; Ex. 7, Justice Dep. 74:15-75:12, 76:4-15, 87:7-14.  *See also* Ex. 1, Grande Dep. 26:5-12; Ex. 5, Benson Dep. 22:10-20, 35:15-36:20.

21.     Each home in which the Plaintiffs worked as Sleep Staff contained at least one bathroom, a kitchen in which the Sleep Staff could cook and eat, as well as a living space for recreational activities such as watching television.  Ex. 2, Clayton Dep. 117:3-119:16, 128:4-6; Ex. 3, Thomas Dep. 84:9-86:6, 125:3-127:21, 128:20-129:5, 139:19-140:4, 147:10-148:10; Ex. 6, Travers Dep. 122:6-123:18, 129:6-130:8; 141:2-142:19; Ex. 7, Justice Dep. 57:6-58:16; Ex. 8, Carr Dep. 105:8-107:4, 112:14-113:14.

22.     Plaintiffs all testified that they had a significant amount of down time while on the clock in which they did not have to complete any tasks.  Clayton testified that much of her shift

---

[1] For a brief period of time while Sleep Staff at Cambridge Commons, Justice slept on a pull-out couch.  Ex. 4, Grande Decl. ¶ 11.

was spent pursuing her own activities, such as watching television, sending text messages, or using Facebook and other social media.  Ex. 2, Clayton Dep. 112:7-113:2.  According to Clayton, she generally spent probably more than three hours per day watching television while on the clock. Ex. 2, Clayton Dep. 111:19-112:6.

23.     Thomas testified that she spent two or three hours a day watching television while on the clock.  Ex. 3, Thomas Dep. 92:14-93:4, 149:2-7.  Thomas also testified that she engaged in other personal activities during her working hours, such as making telephone calls, browsing her cell phone or social media, or sending text messages.  Ex. 3, Thomas Dep. 149:8-16.

24.     Travers also had daily downtime while she was on the clock.  According to Travers, "If I got my work done . . . I will sit down or read me a book or something."  Ex. 6, Travers Dep. 111:7-17.  Travers estimated that she had approximately two hours per day of downtime while on the clock, if not more.  Ex. 6, Travers Dep. 113:17-114:2, 161:3-20.

25.     According to Carr, she had downtime in which she often read, watched television, used her phone, checked Facebook, played games such as Candy Crush and Pet Rescue, or engaged in other private activities.  Ex. 8, Carr Dep. 114:5-9, 132:16-133:16.

26.     Justice testified that he only spent two to three hours per day actually helping clients.  Ex. 7, Justice Dep. 77:11-17.  The remainder of his time spent on the clock was "down time," in which he watched television, relaxed on the couch, or read magazines or books.  Ex. 7, Justice Dep. 78:3-79:3

**D.  Plaintiffs Accepted The Position With A Full Understanding Of Its Requirements**

27.     Plaintiffs were given an explanation of Delmarva's policies and procedures, their job duties and responsibilities as CLAs, as well as an orientation specific to each home in which they worked before they began their employment.  The orientation included, but was not limited

to, a tour of the house and the sleeping quarters, explanation of the e-time system used to clock in and out, and an explanation as to the clients in the home and their individual needs.  Plaintiffs were given the opportunity to contact the residential director, team leader, or human resources department if they had any questions regarding their orientation or the conditions of employment. Ex. 2, Clayton Dep. 67:2-72:18, 82:6-12, 90:4-93:15, 94:12-97:8; Ex. 3, Thomas Dep. 58:20-59:12, 72:20-73:21, 75:14-77:1, 100:2-11, 113:16-21, 114:14-16, 121:2-10, 134:21-135:2; Ex. 6, Travers Dep. 52:10-53:1, 93:14-94:5, 98:11-99:6, 100:12-101:19, 102:14-103:14, 119:18-120:21, 124:3-17, 131:4-132:17; Ex. 7, Justice Dep. 43:17-44:6, 48:18-50:6, 51:10-19, 53:3-9; Ex. 8, Carr Dep. 71:3-72:19, 87:21-89:2, 107:14-108:6.

28.     Delmarva provided the Plaintiffs with a job description for the Maryland Residential Community Living Assistant before they each assumed the position.  Ex. 9, Exhibit 9 to Clayton Dep; Ex. 10, Exhibit 11 to Thomas Dep.; Ex. 11, Exhibit 19 to Thomas Dep.; Ex. 12, Exhibit 8 to Travers Dep.; Ex. 13, Exhibit 14 to Travers Dep.; Ex. 14, Exhibit 6 to Justice Dep; Ex. 8, Carr Dep. 66:13-67:8.  The job description set forth the Plaintiffs' duties and responsibilities, as well as the FLSA non-exempt status of the position.  Ex. 9, Exhibit 9 to Clayton Dep.  Plaintiffs were explained and understood their duties and responsibilities upon hire.  Ex. 2, Clayton Dep. 68:2-4, 83:10-84:15, 135:17-136:8; Ex. 3, Thomas Dep. 66:14-67:7, 71:18-72:3, 119:7-120:12; Ex. 6, Travers Dep. 60:5-10, 77:8-79:3, 105:12-16; Ex. 7, Justice Dep. 43:17-19, 49:17-20.

29.     Additionally, when hired, Plaintiffs were given an Employee Handbook to review. Ex. 15, Plaintiffs' Handbook Acknowledgement Forms.  The Handbook contained an Attendance and Punctuality policy that set forth the schedules and shifts for CLAs, including dayshift, evening shift, weekends, seven days on and seven days off with a sleep shift,[2] and awake overnight.  Ex.16,

---

[2] Seven days on seven days off with a sleep shift is the Sleep Staff shift.

Attendance and Punctuality Policy; Ex. 2, Clayton Dep. 80:20-81:11;  Ex. 3, Thomas Dep. 62:3-63:10; Ex. 6, Travers Dep. 92:6-17; Ex. 7, Justice Dep. 61:8-19.  These shifts were explained to Plaintiffs upon hire, and they were aware of the different shifts to which a CLA could be assigned. Ex. 2, Clayton Dep. 81:9-11, 82:3-5; Ex. 3, Thomas Dep. 62:3-63:10; Ex. 6, Travers 92:15-93:6. Plaintiffs also signed an acknowledgement of receipt of this policy. Ex. 17, Plaintiffs' Acknowledge of Receipt of Attendance and Punctuality Policy.

30.     The Plaintiffs also knew that they were entitled to overtime pay at one and one half times their regular rate of pay.  Ex. 2, Clayton Dep. 89:3-8; Ex. 3, Thomas Dep. 61:19-62:2; Ex. 6 Travers Dep. 90:3-19; Ex. 8, Carr Dep. 126:8-127:6; Ex. 15, Justice Acknowledgement of Receipt of Handbook.  The Handbook also contained a section entitled "Employment Categories," which explained to employees that, "Each employee is designated as either NONEXEMPT or EXEMPT from federal and state wage and hour laws.  NONEXEMPT employees are entitled to overtime pay under the specific provisions of federal and state laws."  Ex. 18, Employment Categories; Ex. 2, Clayton Dep. 134:16-135:13; Ex. 3, Thomas Dep. 61:19-62:2, 63:18-64:8; Ex. 6, Travers Dep. 85:7-86:6.

31.     Indeed, Plaintiffs were explained and understood the requirements of the Sleep Staff position upon hire, including that they had to clock out at night and spend the night at the residential homes, thus they would not be paid for sleep time.  Ex. 2, Clayton Dep. 104:2-6; 109:8-10; Ex. 3, Thomas Dep. 55:5-14, 66:3-5; Ex. 7, Justice Dep. 43:17-44:6, 70:7-9, 76:21-77:4; Ex. 8, Carr Dep. 89:3-8, 91:2-7; Ex. 6, Travers Dep. 69:9-18, 71:2-15, 132:2-133:1, 169:4-170:5; Ex. 1, Grande Dep. 25:3-6.

32.     In fact, Clayton testified that in July 2015, she requested to fill a Sleep Staff position at Delmarva's Thompson Street home.  Ex. 2, Clayton Dep. 103:8-19.  When she requested the

Sleep Staff position, she understood that she would not be paid for sleep time.  Ex. 2, Clayton Dep. 104:2-6, 109:8-10.

33.     Thomas testified that during her interview with Delmarva in February 2009, she informed the Company that she wanted to be considered for a Sleep Staff position, and signed a document confirming her preference.  Ex. 3, Thomas Dep. 54:3-55:14, 56:8-14, 65:19-66:5; Ex. 19, Thomas Signed Request.  Thomas understood the requirements of the Sleep Staff position and that she would not be paid for the time in which she was sleeping.  Ex. 3, Thomas Dep. 55:5-14, 66:3-5.  When Thomas was rehired as Sleep Staff at Delmarva's Glenburn home in 2015, she testified that she understood that she would not be paid for the time in which she was sleeping, but she would be paid if called to assist at night.  Ex. 3, Thomas Dep. 101:2-102:7.  Thomas had the same understanding when she became Sleep Staff at Delmarva's Cabin Creek Home.  Ex. 3, Thomas Dep. 136:14-16.

34.     Carr testified that when hired as Sleep Staff, she knew that she was not going to be paid for her sleep time, and she accepted the Sleep Staff position with knowledge of this policy.  Ex. 8, Carr Dep. 91:2-7.  Justice testified that he understood that he would not be paid for the time in which he slept.  Ex. 7, Justice Dep. 43:17-44:6, 76:21-77:4

35.     Travers testified that she was told at night that she had to punch out and spend the night at the residential homes, thus she knew that she would not be paid for sleep time. Ex. 6, Travers Dep. 69:9-18, 71:2-15, 132:2-133:1, 169:13-170:5.  She accepted the position and worked in it for approximately fifteen years.  Ex. 6, Travers Dep. 69:9-18, 71:2-15, 132:2-133:1, 169:13-170:5.  She testified:

Q: So what did you think happened when you punched out?

A: You just had to stay there.

Q: Right.  But what's the purpose of you punching in and out?

A: Get paid.

Q: So what did you think happened when she said you had to punch out at 10:00 and stay?

A: We didn't get paid.

Ex. 6, Travers Dep. 69:9-18.

36.     Travers further confirmed her understanding that she was instructed to clock out at night and stay on the premises, and accordingly she knew that she would not be paid for sleep time. Ex. 6, Travers Dep. 71:2-15, 169:13-170:5.

37.     Mr. Grande testified that Plaintiffs were told that they would not be paid for sleep time during the interview and hiring process.  Ex. 1, Grande Dep. 25:3-6.

38.     Plaintiffs accepted the Sleep Staff position with full knowledge of its requirements, the schedule, the pay structure, and the facilities in which they would work, sleep, and live for seven days at a time.

**E.  Plaintiffs Accepted And Continued To Work In The Sleep Staff Position For Years**

39.     Throughout the course of her employment at Delmarva, including the two years and four months in which she was Sleep Staff, Clayton never lodged an internal complaint about not being compensated for the time in which she slept, or the manner in which she was paid.  Ex. 2, Clayton Dep. 137:19-138:10, 154:15-155:2.

40.     Thomas, who spent approximately seven and a half years as Sleep Staff, never complained internally about the manner in which she was paid, or the fact that she was not paid for sleep time. Ex. 3, Thomas Dep. 20:12-14, 38:13-19.

41.     Likewise, Travers, who spent approximately fifteen years as Sleep Staff, never complained internally about the manner in which she was paid, or the fact that she was not paid for her sleep time.  Ex. 6, Travers Dep. 158:12-159:5, 165:8-15.

42.     Justice does not allege that he complained about not being paid for sleep time or the way in which he was paid.  When asked what he does with his paycheck, he said, "I look over them, make sure everything is straight and then throw it away."  Ex. 7, Justice Dep. 29:18-30:3.

43.     Carr was employed as Sleep Staff for Delmarva for approximately ten years.  Ex. 4, Grande Decl. ¶ 10.  Other than a vague allegation from Carr that sleep time was discussed at a residential meeting, she did not complain about not being paid for sleep time until she sent Delmarva a letter on November 8, 2018, after this lawsuit was filed, requesting payment for her sleep time.  Ex. 8, Carr Dep. 77:16-18, 128:15-129:2, 130:9-17; Ex. 20, Exhibit 15 to Carr Dep. Carr was asked, "When you got your pay stubs and you looked at it, you never made a complaint?," Carr responded, "I never complained about it, no, I didn't."  Ex. 8, Carr Dep. 77:16-18.  Later in her deposition, when asked about the letter, Carr confirmed that prior to the November 8, 2018 letter, she had not put anything in writing or complained internally regarding her pay. Ex. 8, Carr Dep. 130:9-17.

44.     Clayton, Thomas, Travers, and Justice all unequivocally testified that sleep is not work.  When asked whether she would "consider sleep work," Clayton replied, "No."  She then reaffirmed that she would not consider it work.  Ex. 2, Clayton Dep. 141:3-6.  When asked whether she was working when she was sleeping, Thomas initially laughed, then replied, "I can't work and sleep at the same time."  Ex. 3, Thomas Dep. 110:5-12.  Travers affirmatively stated during her deposition that "Sleep is not work."  Ex. 6, Travers Dep. 162:21-163:2.  Likewise, when Justice

was asked, "During the time you were actually sleeping . . . you weren't doing any work; is that correct," to which he responded, "No."  Ex. 7, Justice Dep. 79:19-80:3.

**F.  Plaintiffs Were Paid Over Minimum Wage And Overtime At Time And One Half Of Their Regular Rate**

45.     When Clayton began her Sleep Staff position at Thompson Street in July 2015, her rate of pay was $10.50 per hour.  Ex. 2, Clayton Dep. 103:5-7.  In December 2015, Clayton received a pay increase to $10.82 per hour.  In May 2017, Clayton received another increase to $11.50 per hour, which was her rate of pay for the rest of her tenure as Sleep Staff.  Ex. 2, Clayton Dep. 151:4-15.

46.     When Thomas was hired as Sleep Staff in February 2009, her rate of pay was $10.00 per hour.  Ex. 3, Thomas Dep. 72:4-8.  Shortly thereafter, in April 2009, her rate of pay increased to $10.50 per hour.  Ex. 3, Thomas Dep. 72:9:14.  When Thomas was rehired as Sleep Staff in January 2014, her rate of pay remained $10.50 per hour.  In December 2015, Thomas received a pay increase from $10.50 per hour to $10.82 per hour, and her rate remained $10.82 per hour until she resigned.  Ex. 3, Thomas Dep. 133:11-134:14, 160:16-18.

47.     Carr was hired by Delmarva at a rate of $9.00 per hour.  At some point, her hourly rate increased to $9.50 per hour, and on September 29, 2008 she received an increase from $9.50 per hour to $10.50 per hour.  Ex. 8, Carr Dep. 86:13-87:17.  In December 2015 Carr received a raise to $10.82 per hour, and in May 2017 her hourly rate increased to $11.00 per hour, which is her current rate.  Ex. 8, Carr Dep. 119:15-121:1.  Carr's current rate of pay is $11.00 per hour.  Ex. 8, Carr Dep. 120:20-121:1.

48.     When Delmarva rehired Travers as Sleep Staff in July 2006, her rate of pay was $9.00 per hour.  Ex. 6, Travers Dep. 74:12-17.  On October 26, 2006, she received a pay increase to $9.50 per hour, and shortly thereafter she received an increase to $10.00 per hour.  Ex. 6, Travers

Dep. 75:1-13.  In April 2007 she received another increase from $10.00 per hour to $11.00 per hour.  Ex. 6, Travers Dep. 156:14-19.  In December 2015, Travers' rate of pay increased from $11.00 per hour to $11.33 per hour, and on May 1, 2017 she received another pay increase to $11.50 per hour.  Ex. 6, Travers Dep. 156:20-157:7.  Her current rate of pay is $11.50 per hour.  Ex. 6, Travers Dep. 156:20-157:7.

49.     Justice earned $10.50 per hour when he was hired by Delmarva in April 2014.  Ex. 7, Justice Dep. 62:10-15.  Throughout the course of his employment at Delmarva, Justice has received pay increases to $10.82 per hour (Ex. 7, Justice Dep. 81:19-21) and $11.00 per hour.  Ex. 7, Justice Dep. 107:12-14.

50.     Plaintiffs also received a significant amount of overtime pay at one and one half times their regular rate of pay.  Ex. 2, Clayton Dep. 150:1-153:17; Ex. 3, Thomas Dep. 153:17-156:12; Ex. 6, Travers Dep. 90:3-12, 153:9-156:7; Ex. 8, Carr Dep. 125:1-7, 126:8-127:6.

## G. The Required Wage and Hour Law Postings Were Conspicuously Displayed At Delmarva's Headquarters

51.     Delmarva Community Services' headquarters are located in Cambridge, Maryland.  Delmarva's community center and administrative offices are located at the headquarters.  Ex. 3, Thomas Dep. 51:17-20.

52.     Delmarva's headquarters contains numerous employment postings, including posters explaining the FLSA and MWHL.  Ex. 21, Exhibit 15 to Clayton Dep.  These postings are located just beyond the front desk in the lobby of the headquarters.  Ex. 1, Grande Dep. 40:1-10; Ex. 3, Thomas Dep. 118:16-119:4; Ex. 6, Travers Dep. 148:5-10.

53.     Plaintiffs went to Delmarva's headquarters for their job interviews, and they went to the headquarters very often throughout the course of their employment.  Plaintiffs all acknowledged that they had seen the postings at headquarters.  Ex. 2, Clayton Dep. 130:4-131:4,

131:13-132:20, 133:10-16, 134:2-12; Ex. 3, Thomas Dep. 51:11-52:2, 115:6-116:5, 116:14-19,

116:20-117:1, 117:14-119:4; Ex. 6, Travers Dep. 142:20-143:12, 145:11-19, 147:7-12, 147:19-

148:4, 148:8-17, 149:11-16, 150:6-151:20; Ex. 7, Justice Dep. 103:18-20, 104:8-12, 105:20-106:6;

Ex. 8, Carr Dep. 117:4-5; 117:15-19, 118:1-21, 119:8-14.

## III.   ARGUMENT

### A.  The Summary Judgment Standard

Under Fed. R. Civ. P. 56, the moving party is entitled to summary judgment if it can

demonstrate that:  (1) there is no genuine dispute as to any material fact; and (2) summary judgment

is appropriate as a matter of law.  *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith

Radio Corp.,* 475 U.S. 574, 587 (1986).  In deciding whether summary judgment is appropriate,

the Court "scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient

proof, in the form of admissible evidence, that could carry the burden of proof of his claim at trial."

*Mitchell v. Data Gen. Corp*., 12 F.3d 1310, 1316 (4th Cir. 1993).

### B.  Plaintiffs' Claims Are Governed, And Barred, By 29 C.F.R. § 785.23

The Department of Labor has implemented three regulations regarding the compensation

of workers' sleep time.  The compensability of sleep time for employees on duty for less than 24

hours is dictated by 29 C.F.R. § 785.21, whereas § 785.22 pertains to employees who work shifts

of 24 hours or more, and § 785.23 pertains to employees who reside on the employer's premises

permanently and for "extended periods of time."  Here, § 785.23 applies.  The Regulation states:

> **An employee who resides on his employer's premises on a permanent basis or
> for extended periods of time is not considered as working all the time he is on
> the premises. Ordinarily, he may engage in normal private pursuits and thus
> have enough time for eating, sleeping, entertaining, and other periods of
> complete freedom from all duties when he may leave the premises for purposes
> of his own. It is, of course, difficult to determine the exact hours worked under**

**these circumstances and <u>any reasonable agreement of the parties which takes</u> <u>into consideration all of the pertinent facts will be accepted.</u>** This rule would apply, for example, to the pumper of a stripper well who resides on the premises of his employer and also to a telephone operator who has the switchboard in her own home. (Skelly Oil Co. v. Jackson, 194 Okla. 183, 148 P. 2d 182 (Okla. Sup. Ct. 1944; Thompson v. Loring Oil Co., 50 F. Supp. 213 (W.D. La. 1943).)

29 C.F.R. § 785.23 (emphasis added).

Plaintiffs' claims are barred by § 785.23 because (1) Plaintiffs worked and slept at the residential homes for seven consecutive days and nights, thus they were employees who resided on the premises for an extended period of time; (2) there was an implied agreement that they would not be compensated for sleep time; and (3) the implied agreement was reasonable.

### 1. Plaintiffs Lived At The Residential Homes For An Extended Period Of Time

As Sleep Staff, Plaintiffs worked shifts of seven consecutive days, beginning on Thursday afternoon, and ending on Thursday morning of the following week. After Plaintiffs' seven day shift, they were off for the following week. Their shifts of seven consecutive days render them employees who reside on the premises for "extended periods of time," pursuant to 29 C.F.R. § 785.23.

Courts have consistently held that employees who work this type of schedule are employees who reside on the premises for an extended period of time for the purposes of § 785.23. Indeed, in *Shannon v. Pleasant Valley Cmty. Living Arrangements, Inc.*, 82 F. Supp. 2d 426, 427 (W.D. Pa. 2000), plaintiffs began a shift on Wednesday at 3:00 p.m., and concluded their shift the following Wednesday at 10:00 a.m., at which time they were off for a week. The employees were required to sleep on the premises, and from the hours of 9:00 a.m. to 3:00 p.m. they were free to leave the premises. *Id.* The court held that because the employees spent seven days at a time on defendant's premises, there was no factual dispute that the employees resided on the premises for an extended period of time, and thus they fell within the ambit of § 785.23. *Id.* at 431.

17

*Beaston v. Scotland Sch. For Veterans' Children*, 693 F. Supp. 234, 238 (M.D. Pa. 1988), *aff'd*, 869 F.2d 587 (3d Cir. 1989), is similarly instructive.  In *Beaston*, employees worked a seven day shift that began at 3:00 p.m. on Friday and ended at 8:30 a.m. the next Friday, followed by one week off.  *Id.* at 235.  From the hours of 8:30 a.m. until 3:00 p.m. Monday through Thursday, the employees were relieved from duty and free to leave.  *Id.*  The court concluded, "[s]ince the[ employees] spend seven consecutive days and nights on campus, they reside there for an extended period of time."  *Id.* at 239.

Plaintiffs' Sleep Staff schedule is nearly identical to the schedules worked by the employees in *Shannon* and *Beaston*, all of whom were found to reside on the premises for an extended period of time.  Here, as in *Shannon* and *Beaston*, the Plaintiffs work a shift of seven consecutive days at Delmarva's residential homes, they are provided time off in the middle of the day to leave the premises, they sleep on the premises for all seven nights of their shift, and their shift is followed by one week off.  Accordingly, the Plaintiffs are considered to reside on the premises for an extended period of time under § 785.23.

### 2.  There Was An Implied Agreement To Deduct Sleep Time

The undisputed material facts show that the Plaintiffs and Delmarva had an implied agreement to deduct sleep time.  It is well established that an agreement to exempt sleep time from paid work under the FLSA can be implied, and need not be in writing.  *See Braziel v. Tobosa Dev. Servs.*, 166 F.3d 1061, 1063 (10th Cir. 1999).  "[A]n implied agreement to deduct sleep time from employee's compensation clearly exists if an affected employee does not assert any verbal or written protest to the arrangement within a reasonable period of time of adoption of the policy or employee being hired under the policy."  *Sidell v. Residential CRF, Inc.*, Civ. No. 1:08-CV-1699-

SEB-DML, 2010 WL 4723722, at *6 (S.D. Ind. Nov. 12, 2010) (citing *Bodie v. City of Columbia, S.C.*, 934 F.2d 561, 566-68 (4th Cir. 1991)).

Indeed, an implied agreement will exist when the employee "understood and acquiesced to the policy when hired." *Braziel*, 166 F.3d at 1063; *see also Hendricks v. Oklahoma Prod. Ctr. Grp. Homes, Inc.*, 159 F. App'x 875, 878 (10th Cir. 2005) (finding implied agreement where "plaintiffs 'understood and acquiesced to the policy when they were hired.'") (quoting *Braziel*); *Johnson v. City of Columbia, S.C.*, 949 F.2d 127, 131 (4th Cir. 1991) ("If the employee contemporaneously protested, the courts have found that there was no implied agreement between the parties.  However, if the employee did not protest and continued to work and receive paychecks, the courts have found that an implied agreement did arise between the parties").

Upon hire, the Plaintiffs were explained the shifts and hours in which they would work. They were told that they would clock out at night, and they could utilize that time to sleep, or engage in the private activity of their choice, so long as they remained on the premises in order to respond to any client emergencies.  To ensure Plaintiffs were compensated for all hours worked, they were instructed to clock in should they need to assist a client overnight, however, all Plaintiffs testified that this did not occur frequently.  Prior to beginning work in a Sleep Staff position, Plaintiffs were given an orientation into the home in which they would be working.  Not only did this allow Plaintiffs to familiarize themselves with the duties and responsibilities of the position, but it also gave them the opportunity to examine the facilities in which they would be sleeping and living for their seven day shift before agreeing to work in the position.

Clayton testified that she requested to fill a Sleep Staff vacancy in July 2015, and when she requested the position she knew she was not going to be paid for sleep time.  According to Thomas, during her interview in February 2009 she told Delmarva that she wanted to be considered for a

Sleep Staff position because it is "[m]ore money," and she understood that she had to clock out at night and stay at the home.  Thomas signed a document reflecting her request for a Sleep Staff position, and she testified that she did so with a full understanding that she would not be paid for her sleep time.  Similarly, Carr and Justice testified that they understood when they were hired as Sleep Staff in 2008 and 2014, respectively, that they not going to be paid for sleep time, and they accepted the position with this understanding.  Travers testified that she was instructed to clock out at night and stay on the premises, thus she knew she was not clocked in and not getting paid for the time overnight.

Plaintiffs agreed to work in the Sleep Staff position with a full and complete understanding of its requirements.  This by itself is sufficient for an implied agreement, as it is evident that the plaintiffs "understood and acquiesced to the policy when hired."  *See Braziel*, 166 F.3d at 1063.

Additionally, Plaintiffs continued to work in the Sleep Staff position and accept paychecks that did not include sleep time, which is further evidence of an implied agreement.  Clayton worked in the position for two years and four months and did not protest or complain about not being paid for sleep time.  Thomas worked as Sleep Staff for almost seven and a half years, and never did she complain internally about the manner in which she was paid, or the fact that she was not paid for her sleep time.  Justice testified that when he received his pay stub, he would "look over them, make sure everything is straight and then throw it away."  Justice, however, never alleges that he complained internally about his pay or not being paid for sleep time, compelling the conclusion that he deemed nothing to be wrong with his checks.

Travers worked as Sleep Staff for at least 15 years and she too never complained internally regarding the manner in which she was paid.  For 15 years she continued to work in the position and accept paychecks in which she was not paid for sleep time.

Other than Carr's vague allegation that at some point during her ten years as Sleep Staff, sleep time was discussed at a residential meeting, and her November 8, 2018 letter, she did not complain about not being paid for sleep time.  Carr knew to report any problems with her paycheck to her supervisor or Human Resources, and she testified that in her ten years as Sleep Staff she never made a complaint after receiving her check.  Indeed, Carr testified that prior to her November 8, 2018 letter, she had not put anything in writing or complained internally regarding her pay.

Plaintiffs accepted their Sleep Staff positions with an understanding that Delmarva did not compensate for sleep time, and some in fact requested to be put in the position.  Plaintiffs continued to work in the position and accept paychecks reflecting this policy for years without complaint or protest.

### 3.   The Implied Agreement Was Reasonable

Section 785.23 "encompasses a wide range of employment relationships and circumstances, and thus there is no single generic test for 'reasonableness' under section 785.23." *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 199 (4th Cir. 2005).  "Ultimately, an agreement reached pursuant to section 785.23 is binding if it is reasonable in light of 'all of the pertinent facts' of the employment relationship."  *Id.* (citing *Leever v. City of Carson*, 360 F.3d 1014, 1018 (9th Cir. 2004)).  It is clear from the record that the agreement between the Plaintiffs and Delmarva was reasonable, and in fact very generous to the Plaintiffs.

### i.   The Sleep Staff Position Is Part Of The Framework Given To Delmarva By The State

Delmarva implemented the arrangement and staffing model bestowed upon them by Maryland's DDA, and still relies on the DDA for funding, all of which is evidence that the agreement is reasonable.  Delmarva has essentially operated as an arm of the state for 40 years. The Sleep Staff position has been a standard practice in the industry for 40 years, with no

intervening change in law.  The DDA and State of Maryland continue to dictate the manner in which Delmarva is able to staff its homes and compensate its employees.  The State and the DDA, therefore, continue to impliedly authorize the Sleep Staff position because the need for the position directly corresponds with the funding authorized and subsequently provided by those entities to Delmarva.

It would be manifestly unjust to punish Delmarva for a position and pay structure that was formulated and implemented by the State, and continues to be validated by the State.  The State and DDA's active involvement in establishing and maintaining the Sleep Staff position is strong evidence that the position, and agreement between Delmarva and the Plaintiffs is reasonable.  Furthermore, the reasonableness of the agreement is supported by case law, as courts have frequently upheld similar sleep time arrangements in the residential group home context.  *See, e.g., Hendricks v. Oklahoma Production Center Group Homes*, 159 Fed. Appx. 875, 877-78 (10th Cir. 2005) (finding reasonable agreement to exclude sleep time from compensable time where plaintiffs understood at the time of hire that sleep time was not compensable and they were paid for interruptions in their sleep); *Braziel v. Tobosa Developmental Servs.*, 166 F.3d 1061, 1063-64 (10th Cir. 1999) (finding an implied agreement when the employee who resided on the premises "for extended periods of time" understood and acquiesced to the policy excluding sleep time, even though employees later complained); *Sidell v. Residential CRF, Inc.*, 2010 WL 4723722 at *7 (S.D. Ind. 2010) (finding implied agreement to deduct eight hours of sleep time from time worked under 29 C.F.R. § 785.22 where employee did not object to the deduction of sleep time from her compensation, she continued to work and accept pay reflecting this policy, she was paid if awakened to care for a consumer, and the employee was provided adequate sleeping facilities); *Ormsby v. C.O.F. Training Services, Inc.*, 194 F. Supp. 2d 1177, 1189 (D. Kan. 2002), *aff'd*, 60 F.

App'x 724 (10th Cir. 2003) (granting summary judgment in favor of non-profit residential group home where plaintiff understood and acquiesced to the policy requiring him to stay on the premises for seven and a half hours overnight for "sleep time" without pay, thus an implied agreement existed); *Blackburn v. Kansas Elks Training Center*, 40. F. Supp. 2d 1270, 1274-75 (D. Kan. 1999) (granting employer's motion for summary judgment where employee resided on the premises for extended periods of time and the parties had a reasonable agreement to deduct sleep time).

### ii. Plaintiffs Were Adequately Compensated For The Work They Performed

It is undisputed that the schedule agreed upon by Delmarva and the Plaintiffs provided them with more than enough time to complete their job duties and responsibilities, leaving sufficient time for personal pursuits such as sleeping, reading, or watching television.  Indeed, the Plaintiffs adhered to the schedules set forth above and remained clocked in, and thus were paid, regardless of whether or not they were actually performing compensable work.  Moreover, Plaintiffs were paid when awoken and required to assist clients, which did not occur frequently.

Clayton testified that she typically spent more than two, and probably more than three hours per day watching television while on the clock.  Thomas testified that she spent two or three hours a day watching television while on the clock.  Thomas also testified that she was able to engage in other personal activities during her working hours, such as make telephone calls, browse her cell phone or social media, or send text messages.  Travers estimated that she had approximately two hours per day of downtime while on the clock, if not more.  According to Carr, she had downtime in which she often read, watched television, used her phone, checked Facebook on her phone, played games such as Candy Crush and Pet Rescue, or engaged in other private activities.  Justice testified that he only spent two to three hours per day helping clients.  The remainder of his time spent on the clock was "down time," in which he watched television, relaxed on the couch, and

read magazines or books.  Despite the personal nature of these activities, Delmarva did not require the employees to clock out, and permitted them to remain on the clock and receive compensation.

Plaintiffs were compensated for the entire time they were on the clock at a rate above minimum wage (and at an overtime rate at time and one half their regular rate where applicable), regardless of whether they were actually performing compensable work. Indeed, Plaintiffs testified to receiving a significant amount of overtime pay while employed as Sleep Staff.

It is further undisputed that the overnight time designated as sleep time was enough time to get a sufficient night's sleep, it was indeed utilized for sleep, or other personal pursuits such as watching television or reading, and it was generally uninterrupted.  Additionally, to ensure Plaintiffs were compensated for all time spent working, they were instructed to clock in at night should they be awoken to assist a client.  While Plaintiffs were called to duty infrequently overnight, they all clocked in and received payment when they were, with the exception of Carr, who testified that she knew she could clock in, but on her own volition chose not to do so.  The totality of the circumstances compel the conclusion that the agreement was reasonable, and any assertion to the contrary lacks merit.

### iii.  The Regulation Does Not Mention Facilities, However, The Facilities Were Sufficient

While the applicable regulation makes no mention of a facilities requirement necessary in order to deduct sleep time from time worked, Plaintiffs were provided sufficient sleeping quarters separate from clients and other staff.  The homes in which Plaintiffs worked were either single family houses, or apartments, furnished with all of the amenities that one would find in their own homes.  Despite the regulation's silence as to facilities and sleeping quarters, if the Court finds that there is some requirement as to the facilities necessary to deduct sleep time, the sleeping quarters and living facilities provided to Plaintiffs are sufficient.  Plaintiffs had their own sleeping space,

and the homes in which they lived had all of the furnishings and amenities of one's residence. Notably, Plaintiffs agreed to the facilities upon acceptance of the position, and have adduced no evidence that they subsequently complained about the sleeping and living facilities. *See Trocheck v. Pellin Emergency Med. Serv., Inc.*, 61 F. Supp. 2d 685, 695–96 (N.D. Ohio 1999) (holding the employee "knew what his sleeping facilities would be like when he was hired, and he never complained about them then or thereafter . . . a reasonable finder of fact could only conclude that [the employee] found the sleeping quarters provided to him by [the employer] were 'adequate[,]' [t]hus, as a matter of law, [the employee] cannot avoid the force of his implied agreement by showing [the employer] violated the FLSA regulations regarding the adequacy of sleeping facilities."); *Sidell v. Residential CRF, Inc.*, 2010 WL 4723722 at *6 (S.D. Ind. 2010) (where the plaintiff never indicated that the sleeping facilities were not adequate, her "failure to complain during the course of her employment" supported the court's conclusion that the sleeping facilities were adequate).

### iv.   The Wage And Hour Division Bulletins Are Not Entitled To Deference

The Department of Labor, Wage and Hour Division ("WHD") has issued less formal guidance to employers on sleep time compensation issues.  A 1981 WHD opinion letter, a 1988 WHD Enforcement Policy, and a 2016 WHD Field Assistance Bulletin state that for an employee to be found to reside on the employer's premises for extended periods of time such that sleep time may be deducted from time worked, the employee must be provided private quarters in a homelike environment.  *See* Dep't of Labor, *Opinion Letter Fair Labor Standards Act* (February 3, 1981), 1981 WL 179033 ("1981 Letter"); Dep't of Labor, *Hours Worked in Residential Care (Group Home) Establishments—Sleep Time and Related Issues—Enforcement Policy* (June 30, 1988), 1988 WL 614199 ("1988 Bulletin"); Dep't of Labor, *Exclusion of Sleep Time from Hours Worked*

*by Domestic Service Employees* (Apr. 25, 2016) ("2016 Bulletin").  The Court should exclude from its analysis any claim that the implied, reasonable agreements between Delmarva and the Plaintiffs are controlled by the guidance promulgated by the WHD, as they impose unreasonable requirements that far exceed the requirements of the law or the regulation.

"A policy statement, which is not either a legislative or interpretive rule, does not carry as much but is 'nonetheless entitled to "some deference,"' but only to the extent that is has 'the power to persuade.'" *Minotti v. Whitehead*, 584 F. Supp. 2d 750, 760 (D. Md. 2008) (citing *Christensen v. Harris Cnty.*, 529 U.S. 576 (2000)) (internal citations omitted).  "The persuasive power of a policy statement depends upon 'the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those facts which give it power to persuade, if lacking power to control.'" *Id.* (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  Moreover, the Supreme Court has held that agency interpretations of their own regulations are entitled to deference only where the language of the regulation is ambiguous.  *Auer v. Robbins*, 519 U.S. 452 (1997); *see also Christensen v. Harris County*, 529 U.S. 576 (2000) (citing *Auer*).[3]

For example, in *Christensen v. Harris County*, 529 U.S. 576 (2000), the Supreme Court declined to defer to a Department of Labor opinion letter interpreting the FLSA's compensatory time off regulations.  The Court held that "[t]o defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation.  Because the regulation is not ambiguous . . . *Auer* deference is unwarranted."  *Id.* at 588.

---

[3] Whether such deference should continue and *Auer* should be overturned is a question currently pending before the Supreme Court.  *See Kisor v. Wilkie*¸ No. 18-15, 139 S. Ct. 657, 202 L. Ed. 2d 491 (2018) (oral argument held March 27, 2019).

Similarly, here, the Court should give no deference to the WHD guidance because they do not have the power to persuade and the regulation is not ambiguous.  Indeed, the guidance imposes upon employers obligations that do not appear in, and go far beyond, the law or the regulation.  As an initial matter, the private quarters requirement is not found in the text of § 785.23.  In fact, § 785.23 is silent regarding an employee's sleeping facilities.  This was plainly a conscious decision, as the regulation pertaining to employees on duty for 24 hours or more, § 785.22, requires "adequate sleeping facilities" for an employer to exclude sleep time from compensable time.

The conspicuous and intended absence of a facility requirement in § 785.23 does not reflect an ambiguity in the regulation that entitles the WHD guidance to judicial deference.  Rather, the calculated absence of a facilities requirement speaks to the intent to indeed impose no such requirement in light of the regulation's direction that "any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted."  To the extent that WHD guidance provides that private quarters in a homelike environment are necessary for a reasonable agreement, this too is extreme overreach, as the regulation explicitly states that all pertinent facts will be considered in determining reasonableness.  An attempt to insert technical requirements in evaluating reasonableness, when reasonableness depends on the context of the situation and totality of the circumstances, contravenes the regulation, and represents WHD's improper attempt to usurp the Court's jurisdiction in determining what is reasonable.  If WHD wishes to impose technical requirements such as private quarters in permitting employers to deduct sleep time from time worked for live-in employees, such requirements should be contained in the regulations which, unlike WHD guidance, are open to notice and comment procedure.

The 2016 Bulletin states that private quarters for live-in employees "reflects the importance of ensuring that an employee who lives and engages in personal pursuits at the worksite has

sufficient amounts of privacy in order to appropriately treat some of her time there as non-compensable."  Dep't of Labor, *Exclusion of Sleep Time from Hours Worked by Domestic Service Employees* (Apr. 25, 2016) ("2016 Bulletin").

However, "section 785.23 establishes a presumption that such employees are not working the entire time they are on the premises," *Garofolo*, 405 F.3d at 200, and there is no mention that this presumption hinges on the facilities provided to the employee.  Indeed, § 785.23 acknowledges "[i]t is, of course, difficult to determine the exact hours worked under the circumstances. . . ."  29 C.F.R. § 785.23.  Accordingly, given the stated presumption, the inquiry should focus on whether the employee in question did indeed engage in normal private pursuits, and not the facilities provided to the employee.  This approach is consistent with the regulation's statement that all pertinent facts will be considered in determining whether a reasonable agreement exists.  To adopt the Bulletin's private quarters requirement "as a rule of law would require the court to ignore an otherwise valid agreement between an employer and employee concerning compensable sleep time as well as all other relevant factors."  *Beaston*, 693 F. Supp. at 238 (declining to "blindly follow" § 785.21).

In light of the absence of ambiguity in the regulation, deference to the WHD guidance is not warranted.  Requiring live-in employees to have private quarters in a homelike environment in order to deduct sleep time from time worked goes far beyond mere interpretation of § 785.23.  It contravenes a conscious decision not to include a facilities requirement in the regulation, and it narrows the regulation in a way that is not tenable and constitutes extreme overreach.

Nonetheless, even if the Court finds the Bulletins instructive, the record is clear that Delmarva provided homelike environments for Sleep Staff employees that consisted of sleeping quarters that were sufficient and set apart from the clients and other staff.

28

### v. Plaintiffs Have Not Rebutted The Presumption That They Were Not Working The Entire Time They Were On The Premises

As established above, 29 C.F.R. § 785.23 applies to the instant case. The regulation "provides a presumption that when an employee resides on his employer's premises, he is not working the entire time he is on the premises." *Myers v. Baltimore Cty., Maryland*, 50 F. App'x 583, 587 (4th Cir. 2002). The burden is on the Plaintiffs to rebut this presumption. *Garofolo v. Donald B. Heslep Assocs., Inc.*, 405 F.3d 194, 198 (4th Cir. 2005). "Thus, the Plaintiffs have the burden of proving the amount of time they were actually *working*." *Sheedy v. BSB Properties, LC*, Civ. No. 2:13-CV-290-JNP, 2016 WL 6902493, at *4 (D. Utah Jan. 26, 2016).

Despite the presumption articulated by Section 785.23 and the Fourth Circuit, Plaintiffs seek compensation for the entire time they were on Delmarva's premises. They attempt to rebut this presumption by arguing that Plaintiffs were required to sleep overnight at the residential homes without compensation. Indeed, the undisputed material facts show that the time overnight for which Plaintiffs seek compensation was utilized for their private pursuits and generally uninterrupted. This time was designated for Plaintiffs' sleep time, however, if they opted not to sleep, they utilized the time to engage in other personal activities such as watching television, reading, or playing games.

Plaintiffs seek precisely what the statute does not permit; a windfall for employees. 29 U.S.C § 251(a)(4) (the purpose of the FLSA was not to award employees "windfall payments . . . of sums for activities performed by them without any expectation of reward beyond that included in their agreed rates of pay."); *see also Shannon v. Pleasant Valley Cmty. Living Arrangements, Inc.*, 82 F. Supp. 2d 426, 433 n.5 (W.D. Pa. 2000) (even if agreement was not reasonable, it did not render the entire agreement invalid and entitle plaintiffs to full compensation for all sleep periods, which "would amount to a windfall.").

Where the regulation does not define what constitutes a reasonable agreement, the Court must examine the totality of the circumstances in the employment relationship to determine reasonableness.  The central question "is whether an agreement existed between [the employer] and [employee] to exempt scheduled sleep periods from hours worked." *Braziel*, 166 F.3d at 1063. *See also Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944) ("The law does not impose an arrangement upon the parties. It imposes upon the courts the task of finding what the arrangement was.").  Not only do the undisputed facts show that there was an agreement between the Plaintiffs and Delmarva to exclude sleep time, but they also compel the conclusion that the agreed upon arrangement was reasonable.  Accordingly, summary judgment is warranted on Plaintiffs' FLSA claims.

## C.  Plaintiffs' State Law Claims Fail Because Defendants' Complied with the FLSA

If the Court finds that a reasonable agreement existed under § 785.23, then summary judgment should be granted as to Plaintiffs' state law claims.  Plaintiffs' state law claims fail as a matter of law because the MWHL regulations are silent as to sleep time, and therefore, the Court should apply the standard under the FLSA to Plaintiffs' state law claims.  The state law claims also fail because they are preempted by the FLSA.

The MWHL regulations do not address compensation for sleep time in the context of an employee who resides on the premises for an extended period of time, like in this case.  However, it does not follow that because the MWHL regulations are silent, an employer and employee cannot enter into a reasonable agreement to exclude sleep time from compensation under Maryland law. The MWHL regulations' silence means that the FLSA controls.  In the absence of direction from Maryland law, Maryland courts, or the DLLR on the issue, the Court should look to the FLSA for guidance in evaluating Plaintiffs' state law claims.  *See Skrzecz v. Gibson Island Corp.*, Civ. No.

RDB-13-1796, 2014 WL 3400614, at *10 (D. Md. July 11, 2014) (holding that because the DLLR's guidance on what constitutes "work" "notes factors that are similar to those identified by the Federal Department of Labor. . . . there is no basis to conclude that the definition of on-call time under the MWHL and the MWPCL is any broader than on-call time under the FLSA."). Indeed, here, too, there is no basis to conclude that the MWHL grants greater protections to employees regarding their compensation for sleep time than under the FLSA.

Additionally, Plaintiffs' state law claims are preempted by the FLSA.  "Since § 785.23 allows the parties to enter into a 'reasonable agreement' when it is difficult to ascertain the number of hours 'worked' by a live-in employee, . . . allowing the state law claims to proceed would hinder the federal objective and render § 785.23 meaningless"  *Balbed v. Eden Park Guest House, LLC*, 881 F.3d 285, 293 n.6 (4th Cir. 2018).  In *Balbed*, the Fourth Circuit did not opine on the matter, and "remand[ed] for initial consideration by the district court."  *Id.*

"The Supremacy Clause of the Constitution makes federal law 'the supreme Law of the Land.'"  *Coll. Loan Corp. v. SML Corp.*, 396 F.3d 588, 595 (4th Cir. 2005) (quoting U.S. Const. art. VI, cl. 2).  "As a result, federal statutes and regulations properly enacted and promulgated 'can nullify conflicting state or local actions.'"  *Id.* (quoting *Nat'l Home Equity Mortg. Ass'n v. Face*, 239 F.3d 633, 637 (4th Cir. 2001)).  "Pursuant to the applicable principles, state law is preempted under the Supremacy Clause in three circumstances: (1) when Congress has clearly expressed an intention to do so ('express preemption'); (2) when Congress has clearly intended, by legislating comprehensively, to occupy an entire field of regulation ('field preemption'); and (3) when a state law conflicts with federal law ('conflict preemption').  *Id.* at 595-96.  The doctrine of conflict preemption "may arise in two circumstances: from a direct conflict between state and federal law, such that compliance with both is impossible (called 'direct conflict'), or because a state law

31

'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' (called 'obstacle preemption')." *Id.* at 596 (quoting *S. Blasting Servs., Inc. v. Wilkes Cnty., N.C.*, 288 F.3d 584, 591 (4th Cir. 2002)). "A state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering with the *methods* that Congress selected for meeting those legislative goals." *Id.*

If Plaintiffs' state law claims, which mirror their FLSA claims, are not barred, then § 785.23 would be rendered meaningless because an employer could enter into a reasonable agreement with its live-in employees and follow the requirements of the regulation, like here, yet still be held liable under state law to employees claiming to have worked every waking hour they lived on the employer's premises. Simply put, allowing the state law claims to proceed would not only discourage such agreements, but would also interfere with the objectives of § 785.23.

**D. Plaintiffs' Claims Are Barred By the Statute of Limitations and Equitable Tolling Should Not Be Invoked**

**1. Statute of Limitations**

Summary judgment is also warranted on Plaintiffs' FLSA, MWHL, and MWPCL claims which fall outside of the statute of limitations. The statute of limitations for FLSA claims is two years, however, the period is three years for willful violations. *Calderon v. GEICO Gen. Ins. Co.*, 809 F.3d 111, 130 (4th Cir. 2015) (citing 29 U.S.C. 255(a)). The statute of limitations under the MWHL and MWPCL is three years. *Guerra v. Teixeira*, Civ. No. CV TDC-16-0618, 2019 WL 330871, at *13 (D. Md. Jan. 25, 2019).

There is, however, no evidence of willfulness. An FLSA violation is willful if an employer knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA. *Calderon*, 809 F.3d at 130. The Sleep Staff position was developed in coordination with the DDA, and Delmarva's current staffing model requires the Sleep Staff position in certain homes as a direct

result of the level of funding provided by the DDA.  The DDA impliedly authorizes the Sleep Staff position.  Moreover, the Sleep Staff position is a standard practice in the industry and has been since the inception of Delmarva's residential program almost 40 years ago.  Finally, Plaintiffs accepted the position and worked in it for years without complaint. If the Court holds that Plaintiffs were entitled to compensation for their sleep time, it is clear that any violations were not willful.

Clayton filed her Complaint on July 10, 2018.  On January 17, 2019, the Court granted Plaintiff's Motion for Leave to File a First Amended Complaint, which added Thomas to the lawsuit.  ECF No. 27.  On February 26, 2019, the Court granted Plaintiffs' Motion for Leave to File a Third Amended Complaint, which added Carr, Travers, and Justice to the lawsuit.  ECF No. 34.  Accordingly, summary judgment should be granted as to all of Clayton's FLSA claims arising prior to July 10, 2016, all of Thomas' FLSA claims arising prior to January 17, 2017, and all FLSA claims brought by Carr, Justice, and Travers arising prior to February 26, 2017.  If Plaintiffs' claims under Maryland law survive, summary judgment should be granted as to all of Clayton's claims arising prior to July 10, 2015, all of Thomas' claims arising prior to January 17, 2016, and all claims brought by Carr, Justice, and Travers arising prior to February 26, 2016.

### 2.  Equitable Tolling

Plaintiffs argue that the Court should apply the doctrine of equitable tolling to permit them to recover for the entirety of their employment with Defendants.

"Equitable tolling is 'a discretionary doctrine that turns on the facts and circumstances of a particular case [and] does not lend itself to bright-line rules.'" *Guerra v. Teixeira*, Civ. No. CV TDC-16-0618, 2019 WL 330871, at *14 (D. Md. Jan. 25, 2019) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)).  "'[A]ny invocation of equity to relieve the strict application of a statute of limitations must be guarded and infrequent[.]'"  *Id.* (quoting *Harris*, 209 F.3d at

330).   Equitable tolling is available to plaintiffs "'in those rare instances where—due to circumstances external to the party's own conduct—it would be unconscionable to enforce the limitation period against the party and gross injustice would result.'"   *Cunningham v. Comm'r of Internal Revenue*, 716 F. App'x 182, 184 (4th Cir. 2018) (quoting *Whiteside v. United States*, 775 F.3d 180, 184 (4th Cir. 2014) (en banc)).   Courts may permit plaintiffs to equitably toll their claims when "(1) 'the plaintiffs were prevented from asserting their claims by some kind of wrongful conduct on the part of the defendant,' or (2) 'extraordinary circumstances beyond plaintiffs' control made it impossible to file the claims on time.'"   *Guerra*, 2019 WL 330871, at *4 (quoting *Cruz v. Maypa*, 773 F.3d 138, 146 (4th Cir. 2014)).

The FLSA requires employers to display in a conspicuous place in every establishment where employees are employed an official poster outlining the provisions of the Act.   29 C.F.R. § 516.4.   The Fourth Circuit has held that the failure of an employer to comply with the posting requirement may justify equitably tolling the statute of limitations.   *Guerra*, 2019 WL 330871, at *14 (citing *Cruz*, 773 F.3d at 146–47).

The genesis of the Fourth Circuit's case law on equitable tolling in FLSA claims stems from its decision in *Cruz v. Maypa*, 773 F.3d 138 (4th Cir. 2014).   In *Cruz*, the Fourth Circuit tolled the statute of limitations where an individual who was essentially imprisoned in her employer's home and spoke limited English did not receive notice of her rights under the FLSA via a posting.   The instant case stands in stark contrast to the scenario described in *Cruz*, and Plaintiffs' attempt to invoke a doctrine intended to be utilized very seldomly and in scenarios more akin to *Cruz* amounts to gross overreach.   It is undisputed that the required employee postings were conspicuously displayed at Delmarva's headquarters just beyond the front desk in the lobby, and Plaintiffs testified that they knew of and had seen the postings.   Accordingly, the Court should

34

decline to apply the doctrine of equitable tolling and should not permit the Plaintiffs to bring stale claims that fall outside of the statute of limitations. *See Escamilla v. Nuyen*, 227 F. Supp. 3d 37, 56-57 (D.D.C. 2017) (holding employer's failure to post notices and informing employee that he was not entitled to overtime did not amount to extraordinary or uncommon circumstances to equitably toll the statute of limitations).

## <u>CONCLUSION</u>

For all of the foregoing reasons, Defendants Delmarva Community Services, Inc., and Santo Grande, are entitled to judgment as a matter of law and respectfully request that its Motion for Summary Judgment be granted and that Plaintiffs' Third Amended Complaint is dismissed with prejudice.

Date: May 6, 2019

Respectfully submitted,

_____/s/_____

Teresa D. Teare (Bar No. 28055)
Paul D. Burgin (Bar No. 20228)
SHAWE ROSENTHAL LLP
One South Street, Suite 1800
Baltimore, MD 21202
Telephone:  (410) 752-1040
Facsimile:  (410) 752-8861
teare@shawe.com
burgin@shawe.com

*Attorneys for Defendant Delmarva Community Services, Inc.*

#727941